# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLYN SULLIVAN,<br><br>       Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>       Defendant. | Case No.  1:16-cv-00186-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S<br>SOCIAL SECURITY APPEAL AND<br>REMANDING FOR FURTHER<br>ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 17, 18, 19) |

## I.

## INTRODUCTION

Plaintiff Carolyn Sullivan ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits and her application for supplemental security income under the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff's impairments included lumbar herniated discs, lumbar radiculopathy, sacroiliac joint pain, chronic pain, insomnia, and anxiety.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 7, 9.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 28, 2013, Plaintiff filed an application for disability insurance benefits under Title II and an application for supplemental security income under Title XVI of the Social Security Act.  (AR 188-95.)   In both applications, Plaintiff alleged disability beginning on December 1, 2010.  (Id.)  Plaintiff's applications were denied initially on August 7, 2013, and on reconsideration on January 6, 2014.[2]  (AR 126-29,131-36.)  Plaintiff requested and received a hearing before Administrative Law Judge G. Ross Wheatley ("ALJ").  Plaintiff appeared for a hearing on December 9, 2014.  (AR 38-71.)  On February 20, 2015, the ALJ issued a decision finding Plaintiff was not disabled.  (AR 23-32.)  On December 10, 2015, the Appeals Council denied Plaintiff's request for review (AR 1-6.)

### A.      Hearing Testimony

Plaintiff appeared with counsel at the hearing before the ALJ on December 9, 2014.  (AR 38-71.)  Plaintiff testified as follows:

Plaintiff was fifty-five years old at the time of the hearing.  (AR 42-43.)  She attended high school until the eleventh grade.  (AR 43.)  She went to truck driving school and had a commercial license, but she no longer has it.  (AR 43.)  She did not receive any specific occupational training for her work as a sterilizer operator and an install technician for a phone company.  (AR 43.)

She last worked in November or December 2010 because of an injury to her back.  (AR 44.)  She indicated that she is being treated for disc issues with sciatica, carpal tunnel, and anxiety.  (AR 44-45.)  She feels that the injury in her back and her legs causes her the greatest problems in her daily life.  (AR 45.)  She has shooting pain in her lower back that shoots down into her legs.  (AR 45.)  It was only on her right side, but now it also is on the left side.  (AR 45.)  Her right foot and left toe go numb, she has muscle spasms in her back if she sits or stands too

---

[2] Although the decision on Plaintiff's request for reconsideration is dated January 3, 2014, it has been crossed out and it states that it was "remailed" on January 6, 2014.  (AR 131.)

long, and she has trouble and great discomfort from bending over and tying her shoes.  (AR 45.)
She can sit for approximately 30 minutes before she has to get up because of tingling and
numbness in her legs.  (AR 57.)  She can stand for approximately 40 minutes before pain shoots
down her back into her legs.  (AR 57.)

She sees Dr. Meetiner K. Rai in Modesto for her back.[3]  (AR 45.)  Plaintiff saw her two
weeks before the hearing and she did not change Plaintiff's medications or treatment.  (AR 46.)
Plaintiff takes Norco, which helps for a short period of time.   (AR 46.)   Dr. Rai has
recommended Tramadol, but Dr. Rai has told Plaintiff that she is not sure how much longer
Plaintiff will get that.  (AR 46.)  She last did physical therapy in 2009 and last had steroidal or
cortisone injections in her back in 2012.  (AR 46.)  The shots helped for a couple of weeks, but
her doctor had indicated that because of her spinal meningitis, she has scar tissue in her lower
back which causes the medication to not be able to get down to the disc, so it does not help for a
length of time.  (AR 47.)  She indicated that she did physical therapy three times, but then her
medical discontinued it.  (AR 47.)  Her doctor had talked about surgery, but then had decided
against it and said that she was not a candidate at that time.  (AR 47.)  She is not currently
receiving any other treatment for her back.  (AR 47.)

She had carpal tunnel surgery on both wrists, which helped for a short period of time, but
then the strength in her hands decreased and she had numbness and tingling in her hands.  (AR
48.)  Four weeks before the hearing, Plaintiff's doctor recommended that she get a brace.  (AR
48.)  "[She] hadn't got one.  [Her doctor] told [her she] had to buy that."  (AR 48.)  Plaintiff
indicated that the braces "seem to help somewhat."  (AR 48.)  The last nerve conduction study
on her hands was two months before the hearing, but she did not know the results.  (AR 48-49.)

As to Plaintiff's anxiety, she is not seeing a psychiatrist and has never seen a counselor.
(AR 49.)  She takes medication that is prescribed by Dr. Rai.  (AR 49.)  The medications cause
her to be tired.  (AR 49.)

Plaintiff testified that her doctor prescribed a cane about four months before the hearing.

---

[3] At the hearing, Plaintiff referred to Dr. Rai as Dr. Meetinder.  However, the record indicates that the name of the doctor is Meetinder K. Rai.  (AR 307, 797.)

1    (AR 49.)  Plaintiff uses it when she goes to the doctor, out to church, and when she leaves her

2    house.  (AR 49.)

3        She lives with her sister and several of her sister's family members and sleeps on the

4    couch.  (AR 50-52.)  She has good days and bad days.  (AR 50.)  When she wakes up, she takes

5    her medication and either sits down or moves around to get the muscles in her back released.

6    (AR 50.)  She then takes a shower and tries to help with dishes.  (AR 50.)  She has problems

7    doing the dishes if she is standing too long, if there are too many people, or if she has a muscle

8    spasm in her hands because of gripping.  (AR 57.)  Sometimes when she is washing dishes or

9    drinking coffee, she loses feeling in her hand and drops what she is holding.  (AR 57.)

10       She does stretching and home exercise that her doctor recommended almost on a daily

11   basis.  (AR 50-51.)  That gives her relief for a little while, but it does not stop her symptoms.

12   (AR 50-51.)  She has a little bit of trouble brushing her hair because of using her hands over her

13   head.  (AR 51.)  Tying her shoes and bending over cause a strain in her back and shooting pain

14   down into her legs.  (AR 51.)  She does not cook, but she microwaves and can make herself a

15   sandwich.  (AR 51.)  She does her own laundry.  (AR 51.)  She tries to read the Bible daily and

16   usually reads it for ten minutes.  (AR 52.)  She does not watch TV programs and does not watch

17   movies.  (AR 52.)  When she sits too long, her legs feel numb and tingle.  (AR 52.)  She does not

18   have a home computer or access to one, but she has used a computer minimally at work before.

19   (AR 52.)  She does not have an email account, but she does have a Facebook account that she

20   uses on her daughter's phone.  (AR 52-53.)  She does not know how to text.  (AR 53.)

21       Her daughter usually goes shopping with her.  (AR 53.)  She has a driver's license, but

22   she does not have a car, so she drives sometimes, but not all the time.  (AR 53.)  She drives to the

23   doctor, which is about two-and-a-half miles there and back.  (AR 53.)  She drives sometimes to a

24   little store around the corner.  (AR 53.)  The longest distance that she drove in the year before the

25   hearing was seven miles when she went to church and back.  (AR 53-54.)  Her daughter drove

26   her to the hearing.  (AR 54.)

27       She went to her son's house, which is about five miles from her, for Thanksgiving and

28   there were about 30 to 32 people there.  (AR 54.)  She does not spend time with friends.  (AR

4

54.)  She tries to attend church on Thursdays and Sundays.  (AR 54.)  There are days she cannot go to church because of muscle spasms in her back that cause her to not be able to sit or stand in the services for too long.  (AR 54, 56.)  She sometimes has to skip church twice a month.  (AR 56.)  If the service goes a little longer, she has to get up and go into the back or outside, because she cannot sit for too long.  (AR 56.)  Sometimes during the day, such as some Sunday mornings when she comes home from church, she has shooting pain into her back and muscle spasms, so she lies down for at least an hour and takes her medication.  (AR 58.)  She takes pain medication and she tries to take her anxiety medication because it helps her relax more.   (AR 58.)  Sometimes she uses a heating pad.  (AR 58.)

Vocational Expert ("VE") George Myers testified at the hearing.  (AR 59-67.)  The VE testified that his testimony would be consistent with the DOT, and if not, he would let the ALJ know.  (AR 60.)  He later testified that his testimony was consistent with the DOT.  (AR 65.)  He had the opportunity to review the file and familiarize himself with Plaintiff's vocational background.  (AR 60.)  He indicated that he was familiar with Plaintiff's past work and that he had submitted a summary of Plaintiff's past work for the past 15 years.  (AR 61.)  He testified that Plaintiff's past work for the past 15 years was as a sterilization operator and a cable splicer.  (AR 61.)  Plaintiff's counsel inquired about the choice for cable splicer instead of installation tech, which the state agency found.  (AR 61.)  The VE indicated that he does not see what the state agency does and that he determined cable splicer by finding the closest DOT to the job description of what Plaintiff was doing based on the work history summary.  (AR 61-62.)  The VE testified that the records indicated that Plaintiff performed the job at the light exertional level.  (AR 62.)  Plaintiff's counsel and the ALJ noted that the job description looked a little above light or borderline, respectively.  The VE indicated that the DOT code is 829.361-010 and the job is performed at light.  (AR 63.)

The first hypothetical that the ALJ gave the VE was for an individual of Plaintiff's age, education, and work experience who is capable of performing at the medium level with sitting, standing, and walking for 6 hours in an 8 hour day and frequent stooping and crouching.  (AR 63-64.)  That individual could perform all of Plaintiff's past work.  (AR 64.)

1    The second hypothetical that the ALJ gave the VE was for an individual who was capable
2    of performing at the light level with the same limitations, only frequent stooping and crouching.
3    (AR 64.)  That individual would be able to perform both jobs according to the DOT, but may not
4    be able to perform the cable splicer job as described by Plaintiff.  (AR 64.)  The cable splicer job
5    could be light or could be construed as medium.  (AR 64.)

6    The third hypothetical the ALJ asked the VE was based on the first and second
7    hypotheticals, but added that the individual would likely have 3 or more unexcused or
8    unscheduled breaks or absences per month.  (AR 64-65.)  That individual would not be able to
9    perform the jobs.  (AR 65.)

10   The fourth hypothetical that the ALJ asked the VE was based on the first and second
11   hypotheticals, but added that the individual would require additional breaks every 2 hours for 15
12   minute stretches.  (AR 65.)  That individual would not be able to perform the jobs.  (AR 65.)

13   Plaintiff's counsel then asked the VE a hypothetical that was based on the ALJ's second
14   hypothetical, but the individual would need a handheld device for extended distances.  (AR 65-
15   66.)  That individual would not be able to perform either one of these jobs with a handheld
16   device.  (AR 66.)  Plaintiff's counsel asked a second hypothetical that did not have the cane
17   limitation, but the individual was limited to frequent on all the manipulatives.  (AR 66.)  That
18   individual would be able to perform past work.  (AR 66.)  If the individual was limited to
19   occasional on all the manipulatives, then that would eliminate past work.  (AR 66.)

20   If Plaintiff had to use a cane, there would be no transferable skills at either the medium or
21   the light level.  (AR 67.)  Plaintiff then testified that she did not work in the sterilizer room on a
22   steady basis, and that she worked warehouse doing bending, lifting, and jacking the trains.  (AR
23   68.)  She indicated that she was a sterilizer relief operator only when the sterilizer operators went
24   on vacation, so she would go in there maybe a week at a time each month unless they were sick.
25   (AR 67.)  The rest of the time she was in the warehouse driving the forklift, lifting pallets, going
26   up and down stairs, standing on the railing, and having to bend over to lift up pallet tops.  (AR

27

28

67-68.)[4]  She pointed out that Dr. Nigel and Dr. Lewis, the two doctors she saw for worker's compensation, only saw her for 30 minutes.[5]  (AR 69.)  Plaintiff testified that she disagreed with Dr. Nigel's finding that she could lift 30 pounds, because she was not able to do that.  (AR 69.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2016;

- Plaintiff has not engaged in substantial gainful activity ("SGA") since December 1, 2010, the alleged onset date;

- Plaintiff has the following severe impairment: lower back pain due to degenerative disc disease ("DDD") of the lumbar spine;

- Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments;

- Plaintiff has the residual functional capacity ("RFC") to perform a wide range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), except Plaintiff can frequently stoop and crouch;

- Plaintiff was capable of performing past relevant work as a sterilizer operator (DOT code 523.685-124, light, and SVP 3) and cable splicer (DOT code 829.361-010, light, and SVP 6).  This work does not require the performance of work-related activities precluded by Plaintiff's RFC; and

- Plaintiff has not been under a disability as defined in the Social Security Act, from December 1, 2010, through the date of the decision.

(AR 23-32.)

/ / /

/ / /

---

[4] The ALJ indicated that Plaintiff's testimony would possibly change how she performed the actual job itself, but it does not change the description of what the job was.  (AR 68.)

[5] It appears that when Plaintiff refers to Dr. Nigel she is actually referring to Dr. Mohinder Nijjar.

# III.

# LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Sec. Admin, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

1  (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

2  considering the record as a whole, a reasonable person might accept as adequate to support a

3  conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

4  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

5  "[A] reviewing court must consider the entire record as a whole and may not affirm

6  simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting

7  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  It is not this

8  Court's function to second guess the ALJ's conclusions and substitute the court's judgment for

9  the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

10 susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

11 upheld.").

12                                           **IV.**

13                            **DISCUSSION AND ANALYSIS**

14  Plaintiff raises four issues in this appeal.  Plaintiff argues that the ALJ erred: (1) by

15 finding that Plaintiff could perform her past relevant work; (2) in formulating Plaintiff's RFC;

16 (3) in his evaluation of the medical opinions in the record; and (4) by failing to give legally

17 adequate reasons to discredit Plaintiff, her relatives, and her friends.

18  **A.    The ALJ Did Not Err in Finding that Plaintiff Could Perform Her Past**
19       **Relevant Work**

20  Plaintiff's argument that the ALJ erred in finding that Plaintiff could perform her past

21 relevant work as a sterilizer operator and cable splicer can be broken down into three arguments.[6]

22 First, as to the cable splicer job, Plaintiff questions whether her work performed so long ago for

23 so little time for Telepro qualifies as past relevant work and whether this position was really as

24 an installation tech, which would be medium work.  Defendant argues that the job at Telepro

25 qualifies as past relevant work and that the VE properly considered Plaintiff's report in analyzing

26 this job.

27

28  [6] In her reply, Plaintiff did not elaborate further on her arguments regarding this issue.

9

1       Based upon the testimony of the VE, the ALJ found that Plaintiff's past work included

2  work as a cable splicer and sterilizer operator. (AR 31.) The VE also found that Plaintiff could

3  perform the duties of a cable splicer and sterilizer operator even with the limitations found in

4  Plaintiff's RFC (light work and limitation to frequent stooping and crouching). (AR 31, 64.)

5       At step four of the sequential evaluation, it is a claimant's burden to show that she does

6  not have the residual functional capacity to perform "past relevant work." Lewis v. Apfel, 236

7  F.3d 503, 515 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520(e) & 416.920(e); Tackett v. Apfel,

8  180 F.3d 1094, 1098 (9th Cir. 1999)). Past relevant work is work that was done within the last

9  15 years, lasting long enough for the claimant to learn to do it, and that was substantial gainful

10  activity. 20 C.F.R. §§ 404.1560(b)(1) & 416.960(b)(1); see also id. at §§ 404.1565(a)

11  (explaining the 15-year guide for determining SGA) & 416.965(a) (same). "A job qualifies as

12  past relevant work only if it involved substantial gainful activity." Lewis, 236 F.3d at 515.

13       While a claimant bears the burden at step four, the ALJ must make the requisite factual

14  findings to support his or her conclusion. Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001).

15  The claimant must be able to perform "[t]he actual functional demands and job duties of a

16  particular past relevant job; or [t]he functional demands and job duties of the occupation as

17  generally required by employers throughout the national economy." Id. at 845 (quoting SSR 82–

18  61). "This requires specific findings as to the claimant's residual functional capacity, the

19  physical and mental demands of the past relevant work, and the relation of the residual functional

20  capacity to the past work." Id. (quoting SSR 82–62). However, the ALJ does not have to make

21  explicit findings regarding the claimant's past work as generally and as actually performed. Id.

22  The VE merely has to find that the claimant can or cannot continue his past work as defined by

23  the regulations. Id.

24       At the December 9, 2014 hearing, the VE testified that Plaintiff's prior work is a

25  sterilization operator and a cable splicer. (AR 61, 305.) The VE testified that he came up with

26  the job cable splicer by looking at the job description of what Plaintiff was doing and he tried to

27  find the closest DOT to the actual job description. (AR 61-62.) The VE considered Plaintiff's

28  own statement regarding the job description and requirements for the Telepro job. (AR 230.) He

1  testified that according to the records, and specifically, the work history summary, she performed

2  the job at the light work level.  (AR 62, 230.)  When presented with a hypothetical containing

3  Plaintiff's RFC, the VE opined:

4          A       Would be able to perform both jobs as per the Dictionary of
        Occupational Titles, and as per the [Plaintiff] who may be able to do the cable

5        splicer, may not be.  As pointed out it's right on the verge of light, somewhere
        between light and medium.

6        Q       Okay.  So both are light as per the DOT --

7        A       Correct.

8        Q       - - [Plaintiff's] answer appears to be - - could be light or it could be

9  construed as medium?

10       A       Correct.

11 (AR 64.)

12       The ALJ determined Plaintiff's RFC and the VE testified that an individual with the

13 stated limitations would be able to perform Plaintiff's past relevant work.  This meets the

14 requirement under the regulations and the ALJ did make specific findings to support his decision

15 that Plaintiff would be able to perform her past relevant work.

16       Plaintiff states that one would question whether this work qualifies as past relevant work

17 because she only earned a little less than $16,000 while working part of the year in 2000 and part

18 of the year in 2001 for Telepro.

19       A claimant is considered to have engaged in SGA if the monthly income was more than

20 $700.00 per month in 2000 and $740.00 in 2001.  20 C.F.R. § 404.1574(b)(2); 20 C.F.R. §

21 416.974(b)(2).[7]  Earnings above the statutory minimum create a presumption that the claimant

22 engaged in substantial gainful activity.  See Katz v. Secretary of Health Human Services, 972

23 F.2d 290, 293 (9th Cir. 1992).  This presumption can be rebutted by factors such as the time

24 spent working, quality of the claimant's performance, special working conditions, or the

25 possibility of self-employment.  Id.

26       While working for Telepro, Plaintiff earned $8,076.75 in 2000 and $7,613.95 in 2001.

27

28 [7] https://www.ssa.gov/OACT/COLA/sga.html.

11

(AR 197-98.)   Plaintiff indicated in her work history summary that she worked for Telepro 8 hours per day 5 days per week and she earned $11.00 per hour.   (AR 230.)   Plaintiff indicated that she started working for Telepro in June 2000, so she worked for Telepro for approximately 7 months in 2000.   Plaintiff's average monthly earnings in 2000 were $1153.82.   It is unclear how many months Plaintiff worked for Telepro in 2001, because there is conflicting information in the record.   Although Plaintiff reported that she worked for Telepro until September 2002, Plaintiff does not have any earnings for 2002 from Telepro on the "WHAT – Work History Assistant Tool" dated May 19, 2014.   (AR 197, 228.)   Plaintiff has earnings in 2001 from Telepro and NCM Services, so it appears that Plaintiff did not work for Telepro for all of 2001. (AR 197-98.)   If Plaintiff only worked for Telepro for 10 or less months in 2001, then her monthly earnings would be above the statutory minimum for 2001.[8]

Plaintiff's earnings of over $700 per month in 2000 were over the statutory minimum creating the presumption that she was engaged in substantial gainful activity.   There is nothing to rebut the presumption.   Based on the record, Plaintiff worked for Telepro for at least 7 months, which was long enough for her to learn the work.   There is no indication that she did not learn the job.   Therefore, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff could perform her past relevant work as a cable splicer.

Plaintiff also raises two arguments based on the ALJ's finding that she could perform her past relevant work as a sterilizer operator.   The Court finds that any error in the ALJ finding that Plaintiff could perform past relevant work as a sterilizer operator is harmless in light of the finding that Plaintiff could work as a cable splicer.[9]

### B.      The ALJ Erred in Formulating the RFC

Plaintiff argues that the ALJ made two errors in formulating Plaintiff's RFC.[10]   First,

---

[8] If Plaintiff's 2001 earnings for Telepro, $7,613.95, are divided by 10, the earnings are $761.40 a month, which is above the statutory minimum for 2001.  However, if her 2001 earnings for Telepro are divided by 11, the earnings are $692.18, which is below the statutory minimum for 2001.

[9] However, the Court notes that because this matter is being remanded for further administrative proceedings because of errors in formulating Plaintiff's RFC, the vocational analysis may need to be redone on remand.

[10] The Court separately discusses Plaintiff's arguments regarding the ALJ's evaluation of the medical opinions in the record.

1   Plaintiff argues that the state agency physicians did not review all of Plaintiff's medical records,

2   including Dr. Nijjar's report, the treatment records of Dr. Rai, and the 2014 MRI of Plaintiff's

3   lumbar spine.  Defendant counters that Plaintiff does not explain how this would be reversible

4   error.  The Court agrees with Defendant that "it is the responsibility of the ALJ, not the

5   claimant's physician, to determine residual functional capacity."  Vertigan v. Halter, 260 F.3d

6   1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545).

7          Second, Plaintiff argues that the ALJ was not qualified to review the range of motion

8   studies in Dr. Nijjar's report or Plaintiff's MRI.  The ALJ referenced Plaintiff's August 5, 2014

9   MRI results as well as Plaintiff's other MRI results and x-ray results.  (AR 28-30.)  In giving

10  little weight to Dr. Wagner, Dr. Wong, and Dr. Jackson's opinions that found that Plaintiff could

11  perform at the medium exertional level, the ALJ discussed the August 5, 2014 MRI results in

12  addition to physical examination results and Plaintiff's complaints in limiting Plaintiff to light

13  exertional level.  (AR 29-30.)

14         The August 5, 2014 MRI of Plaintiff's lumbar spine revealed multilevel degenerative

15  disc disease of the lumbar spine with mild central spinal canal stenosis at L3-4 and L4-5 with

16  bilateral lateral recess stenosis at L4-5.  (AR 765.)  It also showed borderline bilateral foraminal

17  stenosis at L4-L5.  (AR 765.)  The August 5, 2014 MRI results were not considered by Dr.

18  Wagner, Dr. Wong, Dr. Jackson, or Dr. Nijjar, and these MRI results are not identical to

19  previous results that were considered by the doctors.  Here, the ALJ interpreted the MRI results

20  himself.  Therefore, the Court finds that the ALJ erred by interpreting raw medical data in

21  functional terms in formulating Plaintiff's RFC.  See Nguyen, 172 F.3d at 35.

22         **C.     The Action Shall be Remanded for Further Administrative Proceedings**

23         Plaintiff seeks a remand for benefits, or alternatively, a remand for further administrative

24  proceedings.  Defendant contends that remand for benefits is not appropriate.  The ordinary

25  remand rule provides that when "the record before the agency does not support the agency

26  action, ... the agency has not considered all relevant factors, or ... the reviewing court simply

27  cannot evaluate the challenged agency action on the basis of the record before it, the proper

28  course, except in rare circumstances, is to remand to the agency for additional investigation or

1  explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014).

2  This applies equally in Social Security cases. Treichler, 775 F.3d at 1099.

3        Under the Social Security Act "courts are empowered to affirm, modify, or reverse a

4  decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " Garrison

5  v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. §

6  405(g)).  The decision to remand for benefits is discretionary. Treichler, 775 F.3d at 1100.  In

7  Social Security cases, courts generally remand with instructions to calculate and award benefits

8  when it is clear from the record that the claimant is entitled to benefits. Garrison, 759 F.3d at

9  1019.

10       In this instance, it is not clear that Plaintiff would be entitled to benefits as the record

11  needs to be further developed regarding Plaintiff's imaging results.  A medical opinion is

12  necessary to interpret the imaging results in functional terms.  Accordingly, the Court finds that

13  this action shall be remanded for further administrative proceedings.

14       **D.      The ALJ Shall Reconsider Some of the Medical Opinions on Remand**

15       Plaintiff also argues that the ALJ erred by: (1) failing to give adequate reasons for

16  rejecting Dr. Rai's prescription of a cane for walking; (2) failing to give adequate reasons for

17  rejecting Dr. Nijjar's twisting limitation; and (3) failing to address the opinions of Plaintiff's

18  treating physicians in their entirety.

19       The weight to be given to medical opinions depends upon whether the opinion is

20  proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

21  821, 830-31 (9th Cir. 1995).  In general, a treating physician's opinion is entitled to greater

22  weight than that of a nontreating physician because "he is employed to cure and has a greater

23  opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d

24  1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is

25  contradicted by another doctor, it may be rejected only for "specific and legitimate reasons"

26  supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d

27  1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

28  While the ALJ must consider the treating physician's opinion, it "is not necessarily conclusive as

1   to either physical condition or the ultimate issue of disability." <u>Magallanes v. Bowen</u>, 881 F.2d

2   747, 751 (9th Cir. 1989).  The ALJ is not bound by the treating physician's opinion on disability,

3   but cannot reject the opinion without presenting legally sufficient reasons to do so.  <u>See</u> <u>Reddick</u>

4   <u>v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998).

5       Similar to a treating physician, the opinion of an examining doctor, even if contradicted

6   by another doctor, can only be rejected for specific and legitimate reasons that are supported by

7   substantial evidence in the record.  <u>Lester</u>, 81 F.3d at 831.  Greater weight is afforded to the

8   opinion of an examining physician than a non-examining physician.  <u>Andrews</u>, 53 F.3d at 1041.

9       Where the treating physician's opinion is contradicted by the opinion of an examining

10  physician who based the opinion upon independent clinical findings that differ from those of the

11  treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to

12  resolve the conflict.  <u>Andrews</u>, 53 F.3d at 1041.  However, if the nontreating physician's opinion

13  is based upon clinical findings considered by the treating physician, the ALJ must give specific

14  and legitimate reasons for rejecting the treating physician's opinion that are based on substantial

15  evidence in the record.  <u>Id.</u>  The contrary opinion of a non-examining expert is not sufficient by

16  itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's

17  opinion, however, "it may constitute substantial evidence when it is consistent with other

18  independent evidence in the record." <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).

19      1.    <u>The ALJ Did Not Err in Rejecting Plaintiff's Claim that She Needed a Cane and</u>
             <u>Dr. Rai's Opinion for a "Walking Cane"</u>
20

21      Plaintiff asserts that if the ALJ had not rejected her need for a cane, then she would not

22  be able to perform light work.[11]  Plaintiff contends that her need for a cane is supported by the

23  opinion of Dr. Rai, her treating physician.  Plaintiff argues that the ALJ was not qualified to

24  make a medical necessity determination, which requires medical judgment.  Defendant counters

25  that the ALJ properly found that a cane was not mentioned in any treatment records, was

---

26  [11] Plaintiff argues that her ability to ambulate around a room is of limited relevance, because if she needed the cane
     to ambulate for extended distances, then she could not perform her past relevant work.  The VE testified that if an
27  individual needed a handheld device for extended distances, than the individual could not perform Plaintiff's past
     work.  (AR 66.)
28

1    unnecessary in the consultative examination, and was used lightly during the hearing.

2          The ALJ noted that Plaintiff testified that she uses a prescribed cane when she leaves the

3    house, but the record did not indicate that the cane was prescribed, except for a prescription note

4    that was produced after the hearing.  (AR 29.)  Dr. Rai wrote a prescription note on February 3,

5    2014, for a "walking cane."  (AR 307.)  The ALJ found that:

6             During the course of the Hearing, the undersigned noted [Plaintiff] walked easily
             and had the cane but used it "lightly" almost to the extent of simply "carrying it."
7             Moreover, the use of a cane is not mentioned in any of the available treatment
             records.  Given [Plaintiff's] normal gait and strength findings, it would appear
8             that the use of a cane is not medically necessary as noted by the (CE).

9    (AR 29.)

10         Plaintiff points to SSR 96-6p, which states that "[w]hen an updated medical judgment as

11   to medical equivalence is required at the administrative law judge level in either of the

12   circumstances [outlined in this section], the administrative law judge must call on a medical

13   expert."  SSR 96-6p.  This was not a situation where there was a question as to medical

14   equivalence that would have required the testimony of a medical expert.  Further, as discussed

15   below, the ALJ provided proper reasons to reject Plaintiff's claim and Dr. Rai's opinion

16   regarding the use of a cane.

17         While the Ninth Circuit has "disapproved of so-called 'sit and squirm' jurisprudence," an

18   ALJ may properly consider inconsistencies in a claimant's testimony and conduct at the hearing

19   when assessing credibility.  Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (finding that

20   the ALJ's comments on the fact that the plaintiff exhibited symptoms that were inconsistent with

21   the medical evidence and plaintiff's other behavior at the hearing were proper) (quoting Morgan

22   Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (holding that an ALJ may

23   properly consider his or her observations) and citing Perminter v. Heckler, 765 F.2d 870, 872

24   (9th Cir. 1985) (finding that an ALJ cannot deny benefits based on observations at the hearing

25   when plaintiff's statements to the contrary are supported by objective evidence)).

26         Here, the ALJ observed that Plaintiff walked easily during the hearing and used the cane

27   lightly, almost like she was carrying it.  (AR 29.)  While Plaintiff argues that the ALJ's

28   observations of Plaintiff's ability to ambulate within the confines of a hearing or examination

1   room are of limited probative value, the Court notes that Dr. Rai's note is not for a cane for
2   extended distances, but for a "walking cane." (AR 307.) Also, Plaintiff testified that she used
3   the cane when she went out of the house, and did not specifically testify that it was only for
4   distances over a certain length. (AR 49.) The ALJ's observations of Plaintiff's conduct, and
5   specifically whether Plaintiff used a cane, is a proper reason to reject Plaintiff's claim that she
6   needed a cane and to reject Dr. Rai's opinion.

7          As Plaintiff points out in her reply, if a treating physician's opinion is not given
8   controlling weight, the ALJ will consider factors that include whether the opinion is consistent
9   with the record as a whole. See 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927(c)(2)-(6). Here, the
10  ALJ considered the record as a whole when determining whether to reject Plaintiff's claim that
11  she needed to use a cane when she leaves the house and whether to reject Dr. Rai's opinion.
12  Plaintiff does not point to any other medical evidence related to her use of a cane other than the
13  two-word note from Dr. Rai.

14         The Court agrees with Defendant that the consultative examiner, Dr. Robert Wagner's
15  observations were far more detailed than the two-word note from Dr. Rai and distinguish this
16  case from Jenkins v. Astrue, 628 F.Supp.2d 1140, 1149 (C.D. Cal. 2009). In Jenkins, the court
17  found that a treating physician's "interpretation of her objective and clinical findings trumps a
18  contrary interpretation based on nothing more than the ALJ's conflicting view of their
19  significance." Jenkins, 628 F.Supp.2d at 1149. Here, the ALJ relied on Dr. Wagner's findings
20  and opinion that Plaintiff could ambulate without an assistive device, as well as other evidence in
21  the record, and not merely on his own conflicting view of Dr. Rai's opinion.

22         Dr. Wagner observed that Plaintiff was "easily able to get up out of a chair in the waiting
23  room, walked at a brisk pace back to the exam room without assistance[,] [ ] sat comfortably[,] [
24  ] was very easily able to get on and off the exam table[,] [and] [ ] was very easily able to bend
25  over at the waist [and] pick up a shoe off the ground with only slight appearance of stiffness
26  when doing so (this was from a standing position)." (AR 515.) Dr. Wagner specifically found
27  that an assistive device was not necessary during the physical examination. (AR 516.) He found
28  that she had 5/5 motor strength in her upper and lower extremities, negative seated straight leg

1  raise, positive supine bilaterally at 90 degrees, and lumbar range of motion for flexion is 0-85

2  degree, extension 0-20 degrees, and lateral flexion 0-20 degrees bilaterally.  (AR 516-17.)  He

3  also found that she could very easily walk on her toes and heels and she did not have any back

4  pain doing so.  (AR 516.)  For his medical source statement, Dr. Wagner found that Plaintiff

5  could stand and walk up to 6 hours, could lift and carry 50 pounds occasionally and 25 pounds

6  frequently, could frequently stoop and crouch, had no limitations for sitting, manipulative

7  activities, or workplace environmental activities, and it was not necessary to use an assistive

8  device.  (AR 517-18.)  In addition, another examining physician, Dr. Nijjar, found that Plaintiff

9  could ambulate without any restrictions.  (AR 707.)

10      Further, the majority of Dr. Rai's own treatment notes do not support the prescription for

11  a "walking cane."  In Dr. Rai's February 3, 2014 treatment note, she did not mention that

12  Plaintiff needed a cane or that she was recommending a cane.  (AR 791-92.)  However, she did

13  indicate other options for management of Plaintiff's conditions.  (AR 791.)  Plaintiff was advised

14  to get adequate rest and to decrease stress and Plaintiff was told to remove caffeine from her diet.

15  (AR 791.)  In Dr. Rai's February 11, 2014 treatment note, she did not mention the she had

16  prescribed a cane.  (AR 796-97.)

17      In Dr. Rai's January 21, 2014, February 3, 2014, February 11, 2014, April 11, 2014,

18  April 28, 2014, June 10, 2014, July 18, 2014, August 5, 2014 treatment notes, Plaintiff had a

19  normal gait with no atrophy or crepitus, 5/5 power in all extremities, and a decreased range of

20  motion in her lumbosacral area.  (AR 769, 773, 775, 783, 785, 791, 793, 796.)  The March 4,

21  2014, March 12, 2014, May 12, 2014, May 27, 2014, June 19, 2014 treatment notes indicate

22  normal gait with no atrophy or crepitus, 5/5 power in all extremities, and a decreased range of

23  motion in the lumbosacral area with a muscle spasm present bilaterally.  (AR 771, 777, 781, 788,

24  789.)  On August 5, 2014, August 18, 2014, and September 3, 2014, she had 5/5 power in all

25  extremities, a normal gait with no atrophy or crepitus, and a decreased range of motion in the

26  lumbosacral area with tenderness in the bilateral paravertebral spine, especially at the L1-L5

27  level.  (AR 759, 761, 769.)  The September 17, 2014, October 3, 2014, and November 5, 2014

28  treatment notes indicate 5/5 power in all extremities, a normal gait with no atrophy or crepitus,

1   and a decreased range of motion in the lumbosacral area with muscle spasm present bilaterally

2   and tenderness in the bilateral paravertebral spine, especially at the L1-L5 level.  (AR 753, 755,

3   757.)  On November 21, 2014, Plaintiff had 5/5 power in all extremities, decreased range of

4   motion in the lumbosacral area with a muscle spasm present bilaterally and tenderness in the

5   bilateral paravertebral spine, especially at the L1-L5 level, and tenderness in the left hip with

6   decreased range of motion.  (AR 751.)

7        Dr. Rai's March 4, 2014, March 12, 2014, April 28, 2014, May 12, 2014, and May 27,

8   2014, August 18, 2014, September 3, 2014, September 17, 2014, October 3, 2014, November 5,

9   2014, and November 21, 2014 treatment notes indicate that Plaintiff's back pain was moderate,

10  intermittent, and increases on movements, but there was no radiation of the pain.  (AR 751, 753,

11  755, 757, 759, 761, 777, 781, 783, 788, 789.)  The July 18, 2014 treatment note from Dr. Rai

12  notes that Plaintiff's lower back pain was moderate, intermittent, increases on movements, and

13  radiates to the back of the legs and the legs feel numb.  (AR 775.)

14       Those findings indicated that Plaintiff was able to walk without difficulty and had

15  acceptable strength and motor function, in contrast to Dr. Rai's finding that Plaintiff needed a

16  "walking cane."  An ALJ may reject a doctor's medical opinions that are inconsistent with the

17  underlying treatment notes.  Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003); Valentine,

18  574 F.3d 685, 692-93 (9th Cir. 2009); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001).

19  In addition, the ALJ is to resolve any conflicts of evidence in the record.  Andrews, 53 F.3d at

20  1041.

21       Therefore, the Court finds that the ALJ did not err in rejecting Dr. Rai's opinion that

22  Plaintiff needed a "walking cane" and rejecting Plaintiff's claim that she needed a cane when she

23  leaves the house because the ALJ provided specific and legitimate, and even clear and

24  convincing reasons supported by substantial evidence.

25       2.    The ALJ Did Not Err in Rejecting Dr. Nijjar's Limitation for Repetitive Twisting

26       Plaintiff argues that the ALJ provided legally inadequate reasons for rejecting part of the

27  opinion of Dr. Nijjar, a qualified medical evaluator for Plaintiff's worker's compensation claim,

28  who opined that Plaintiff was precluded from repetitive twisting.  Plaintiff contends that the ALJ

1   did not understand the basis of Dr. Nijjar's opinion and points out that Dr. Nijjar noted scapular

2   pain.   Defendant argues that scapular pain relates to the upper back and shoulder, but the

3   limitation was for twisting at the waist.   Defendant contends that Dr. Nijjar does not explain how

4   scapular pain would lead to a limitation on twisting at the waist.   Defendant also points out that

5   Dr. Wagner did not impose a limitation on twisting.

6       Here, there are contradictory opinions in the record so the ALJ is to determine credibility

7   and resolve any conflicts.   Batson, 359 F.3d at 1195.   The ALJ rejected the part of Dr. Nijjar's

8   opinion regarding twisting because "there is little evidence or other indications limiting

9   [Plaintiff] from twisting." (AR 30.)   Although Defendant argues that it is unclear how Plaintiff's

10  scapular pain is related to a limitation from repetitive twisting at the waist, Dr. Nijjar found that

11  limitation, and the Court is not in the position to find that this limitation could never be related to

12  any scapular pain.

13      Dr. Nijjar noted in the vocational rehabilitation section of the August 11, 2014 qualified

14  medical evaluation that Plaintiff could not do any repetitive twisting at the waist.   (AR 707.)   Dr.

15  Nijjar noted that Plaintiff "complain[ed] of occasional pain in the scapular area which is aching

16  in intensity and usually comes when she sits in one place for 20-30 minutes.   The pain does not

17  radiate to the upper extremities and [she] has no neck pain." (AR 691.)   During the examination,

18  Dr. Nijjar found that Plaintiff's thoracic spine has no tenderness or deformity, no paraspinal

19  muscle spasm, no tenderness along the medial border of the scapula and no muscle spasm in the

20  trapezius or rhomboids, no crepitus in the thoracoscapular articulation, and no atrophy of the

21  supra- or infrascapular muscles.    (AR 701.)    Dr. Nijjar diagnosed Plaintiff with

22  "[p]ain around the shoulder blades."  (AR 704.)  When evaluating Plaintiff's shoulder blade pain

23  in terms of impairment according to the AMA *Guides to the Evaluation of Permanent*

24  *Impairment*, 5th edition, Dr. Nijjar noted that there are no objective findings except slight

25  tenderness along the medial boarder of the scapula, but found that Chapter 18 for Pain is

26  appropriate to consider.[12]  (AR 705-06.)  Dr. Nijjar found that 2% WPI is appropriate.  (AR 706.)

27

28  [12] When considering Chapter 18 of the AMA Guides, a whole person impairment rating ("WPI") may be increased
    by 0% up to 3% WPI if the burden of the worker's condition has been increased by pain related impairment in

20

1    Dr. Nijjar noted that future medication for Plaintiff's scapular pain may be pain medication
2    according to MTUS guidelines.  (AR 707.)

3            Plaintiff contends that the ALJ's conclusions are based on his lay opinion because no
4    medical expert reviewed Dr. Nijjar's report.  Plaintiff is correct that the ALJ is not qualified to
5    interpret raw medical data in functional terms.  See Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.
6    1999).  However, here, the ALJ did not interpret raw medical data in functional terms.  The ALJ
7    considered whether the examinations of Plaintiff and the opinions of the other physicians in the
8    record support the twisting limitation.  None of the other physicians in the record found a
9    twisting limitation, except for Dr. Isho who limited Plaintiff to occasional twisting in August
10   2011 and December 2011.  (AR 405, 419.)  Plaintiff does not point to any physical examination
11   findings regarding the scapula.  During Dr. Wagner's consultative examination, Plaintiff
12   complained of some numbness between her shoulder blades at times when she is having low
13   back pain.  (AR 514.)  While Plaintiff had some low back pain with reported radiation down the
14   right thigh during the examination, there was no reported scapula pain.  (AR 514-18.)  Also, at
15   the hearing, Plaintiff did not testify that she has pain or any limitations with twisting.  (AR 42-
16   59, 67-69.)  Review of the record demonstrates that substantial evidence supports the ALJ's
17   finding that there is little evidence or other indications limiting Plaintiff from twisting as the
18   diagnostic findings, objective evidence, and other opinions in the record do not support this
19   limitation.

20           Therefore, the Court finds that the ALJ did not err in rejecting Dr. Nijjar's opinion
21   regarding the twisting limitation because he provided specific and legitimate reasons to reject the
22   opinion that are supported by substantial evidence.

23           3.      The ALJ Should Reconsider All of the Opinions from Dr. Isho and Kaiser on
24                   Remand

25           Plaintiff argues that the ALJ erred by failing to address all of the opinions of Plaintiff's

27   excess of the pain component already incorporated in the WPI rating based on the body or organ rating system in the
     other chapters.      QME- Understanding Pain Related Impairment; Chapter 18 of the AMA Guides,"
28   http://behavioralhealthce.com/index.php?option=com_courses&task=view&cid=120 (last visited on Feb. 22, 2017).

treating physicians at Kaiser, including Dr. Isho.  Defendant counters that while the records spanned more than 12 continuous months, they did not consider her functioning over this entire period.  Defendant also argues that the ALJ properly found that the opinions were inconsistent with Plaintiff's good physical examination findings, good activities of daily living, and conservative treatment.  (AR 30.)  In her reply, Plaintiff argues that the record, except for when she was uninsured from sometime in 2012 through January 2014, is replete with significant clinical and objective findings that support the opinions of her treating physicians.  She argues that the ALJ failed to explain why the clinical findings and imaging reports are not consistent with the treating physicians' opinions.

The ALJ need not discuss all evidence presented, but must explain why significantly probative evidence has been rejected.  Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984).

Here, the ALJ referenced temporary work restrictions from Dr. Zaia Isho over brief periods from August 2011 to September 2011 and from November 2011 to December 2011 and the fact that Dr. Isho put Plaintiff on light duty with no lifting and bending and limited her to 8 hours of work in August 2012.  (AR 30, 405-19, 527, 643.)  Plaintiff points to some of the opinions of Plaintiff's physicians at Kaiser, including Dr. Isho, that were not specifically referenced by the ALJ.  (AR 326, 351, 392, 419, 449, 486-87, 524, 618, 627.)  It appears that Defendant is arguing that the reasons the ALJ gave for rejecting some of the opinions of Dr. Isho would also apply to the other opinions of Dr. Isho and the opinions of other doctors at Kaiser.  As the Court finds that the matter should be remanded for further administrative proceedings based on errors by the ALJ in formulating Plaintiff's RFC, the ALJ should reevaluate the opinions of Dr. Isho and other doctors at Kaiser by considering all of the opinions and treatment notes.  Although the weight given by the ALJ to Dr. Isho's opinions may not change, and the ALJ may reject the opinions of the other doctors for the same reasons, these are determinations for the ALJ to make after considering all of the opinions of Dr. Isho and the other doctors at Kaiser.

/ / /

**E.      The Court Declines to Address Plaintiff's Arguments Regarding Her Credibility and the Credibility of Her Friends and Relatives**

Plaintiff argues that the ALJ failed to provide clear and convincing reasons to reject her testimony and the testimony of her friends and relatives.  Defendant counters that the ALJ properly evaluated the subjective complaints and testimony of Plaintiff, her friends, and relatives and found the testimony to be not credible.

The ALJ found that "[a]lthough [Plaintiff's] impairments do cause some pain, the objective findings contained in the record, the conservative treatment she has received, and her ability to perform a wide range of daily activities, all suggest that this pain is not as severe or as limiting as she claims."  (AR 29.)  As to Plaintiff's friends and relatives' statements, the ALJ gave their statements little weight "to the extent that [they] indicate[ ] the [Plaintiff's] inability to perform work under this residual functional capacity for the same reasons that the [Plaintiff's] subjective complaints are not fully credible.  As discussed above, the [Plaintiff] reported good activities of daily living and did not have the treatment one would expect for a totally disabled individual, with minimal objective findings."  (AR 31.)

One of the ALJ's reasons for discounting Plaintiff's testimony and the testimony of her friends and relatives was that the objective findings in the record suggest that the pain is not as severe or as limiting as the testimony claims.  The ALJ's findings regarding credibility may change once the record is further developed on remand regarding the imaging results.  On remand, the ALJ will have the opportunity to reassess the credibility of Plaintiff and her friends and relatives' testimony in light of the further-developed record.  Therefore, the Court declines to further address this argument at this time.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**V.**

**CONCLUSION AND ORDER**

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART and this action is remanded back to the Commissioner for further administrative proceedings consistent with this opinion.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **March 21, 2017**

UNITED STATES MAGISTRATE JUDGE